# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| CLEVELAND CLINIC HEALTH SYSTEM - EAST REGION *et al.*, | ) CASE NO. 1:11-cv-2074 ) |
| Plaintiffs, | ) JUDGE JAMES S. GWIN ) ) |
| v. | ) MAGISTRATE JUDGE ) NANCY A. VECCHIARELLI ) |
| INNOVATIVE PLACEMENTS, INC. *et al.*, | ) ) **MEMORANDUM OPINION AND** ) **ORDER** |
| Defendants. | ) Doc. No. 58 |

This case is before the undersigned United States Magistrate Judge upon referral to resolve the discovery dispute set forth in Defendants' letter to the Court (Doc. No. 40), as well as "[a]ny subsequent matters or pleadings filed that are related to [the] discovery dispute." (Doc. No. 41.) Before the Court is a motion for a protective order filed by Plaintiffs Cleveland Clinic Health Systems - East Region (doing business as Huron Hospital) and the Cleveland Clinic Foundation (collectively "Plaintiffs"). (Doc. No. 58.) Defendants Innovative Placements, Inc. ("IPI") and Richard Briganti ("Briganti") (collectively "Defendants") oppose. (Doc. No. 69.) For the reasons set forth below, Plaintiffs' motion for a protective order is GRANTED.

I.

On or about February 6, 2008, a patient known as "M.D." died in Huron Hospital's emergency department.  The record reflects that M.D. had been admitted to the emergency department on the evening of February 5, 2008, for alcohol intoxication; was not fully connected to the emergency department's monitoring systems; and was found dead the following morning.  Briganti was a nurse at Huron Hospital who was involved with the care of M.D.  IPI employed Briganti and staffed him at Huron Hospital.  M.D.'s estate sought compensation for M.D.'s death from Plaintiffs, and Plaintiffs reached a settlement agreement with M.D.'s estate before the estate filed suit against them.  Plaintiffs thereafter filed a complaint against IPI and Briganti for indemnity.

On April 2, 2012, Defendants filed a letter with the Court alleging that Plaintiffs had failed to respond to Defendants' discovery requests properly and adequately, and that the parties were at an impasse in resolving the discovery dispute.  (Doc. No. 40.)  On April 10, 2012, the Magistrate Judge held an in-person conference, on the record, to address the discovery dispute.  (*See* Doc. No. 54.)  Some of the discovery issues were resolved; however, Plaintiffs maintained that some of the documents Defendants requested were protected by Ohio's peer review privilege statute, Ohio Revised Code Section 2305.252 ("§ 2305.252"), as well as by the attorney-client privilege and the work product doctrine.

The Court directed Plaintiffs to:  (1) produce a privilege log that included sufficient descriptive information about the allegedly privileged documents; (2) file a motion for a protective order explaining why each privilege applied to each document; and (3) deliver to the Magistrate Judge's chambers, in a sealed envelope and for *in*

*camera* inspection if necessary, un-redacted and redacted copies of the documents over which Plaintiffs claimed privilege. (Doc. No. 54.) The Court directed Defendants to respond and permitted Plaintiffs to reply. (*See* Doc. No. 54.)

On April 17, 2012, Plaintiffs: filed their motion for a protective order (Doc. No. 58); filed a "Notice of Submission of Confidential Peer Review and Attorney-Client Communication Documents for *In-Camera* Review," and a "Supplemental Peer Review Privilege Log" dated April 16, 2012 (Doc. No. 60); and delivered to the Magistrate Judge's chambers, in a sealed envelope, copies of the documents over which they claimed privilege. Plaintiffs claimed privilege over thirty-six (36) pages of documents that are bates-numbered "CC v. IPI Pl Peer Review 001" through "036" (collectively "the Documents"). Plaintiffs state that the Documents consist of the following:

(1)   A "CCHS Claim Review Report" (bates numbers 2-10);[1]

(2)   A timeline and accompanying notes (bates numbers 11-20 and 25-26);

(3)   Notes relating to a "Root Cause Analysis" ("RCA") (bates numbers 21-24);

(4)   The RCA report (bates numbers 27-32); and

(5)   Two print-outs of a "Safety Event Reporting System" ("SERS") quality review incident report (bates numbers 33-36).

(*See* Pls.' Mot. Protective Order 3; Privilege Log April 16, 2012.)

On April 23, 2012, Defendants filed their response in opposition to Plaintiffs' motion for a protective order. (Doc. No. 69.) Defendants contend: (1) Plaintiffs' privilege log is inadequate and fails to comply with the Court's April 10, 2012, Order

---

[1] The document with bates number 1 is a cover sheet and not a record related to M.D.'s death.

3

because it lacks the detail the Court required;[2] (2) the Documents are not privileged under Ohio law; (3) even if the peer review privilege applies, the Documents are discoverable pursuant to the fairness doctrine and/or because Plaintiffs waived the privilege by putting the Documents at issue in this case; and (4) even if the work product doctrine applies to the Documents, good cause exists to compel production of the Documents.

On April 24, 2012, Plaintiffs filed a reply. (Doc. No. 71.) Plaintiffs attached to their reply a second "Supplemental Peer Review Privilege Log" dated April 24, 2012. (Doc. No. 71-1.) Plaintiffs explain that this updated privilege log contains additional detail not included in the previous privilege log because the additional information was not available by April 17, 2012. (Pls.' Reply 1.) Plaintiffs also attached to their reply a declaration from Ms. Carol J. Moskowitz ("Moskowitz"), who states she is a Registered Nurse and a licensed attorney who works for Plaintiffs and participated in Plaintiffs' investigation of M.D.'s death. (Doc. No. 71-2). The declaration is attached to this Memorandum Opinion and Order as an Appendix.

The Magistrate Judge reviewed each of the Documents presented by Plaintiffs *in camera*.

---

[2] Defendants request that, "based on Plaintiffs' inadequate Privilege Log, . . . the Court deny Plaintiffs' Motion for Protective Order and compel production of the documents or, in the alternative, compel Plaintiffs to produce a supplemental/ revised Privilege Log complying with the Court's April 11, 2012 Order and award costs and fees to Defendants." (Defs.' Response 4.) Plaintiffs have since filed with their reply brief a supplemental/revised privilege log that appears to cure any deficiencies. Further, Defendants do not explain any factual or legal basis for an award of costs and fees.

4

**II.**

**A.     Ohio's Peer Review Privilege**

In cases of diversity jurisdiction, privileges are determined in accordance with state law. *See Grupo Condumex, S.A. de C.V. v. SPX Corp.*, 331 F. Supp. 2d 623, 629 n.3 (N.D. Ohio 2004); Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Privileges are to be strictly construed, and the party claiming the privilege has the burden of proving that the privilege applies to the requested information. *Ward v. Summa Health Sys.*, 184 Ohio App. 3d 254, 261, 920 N.E.2d 421, 426 (Ohio Ct. App. 9th Dist. 2009). Plaintiffs argue that the Documents are subject to Ohio's peer review privilege. For the following reasons, the Court agrees.

§ 2305.252 provides the following:

Proceedings and records within the scope of a peer review committee[3] of a

---

[3] A "peer review committee" is defined as follows:

> "Peer review committee" means a utilization review committee, quality assessment committee, performance improvement committee, tissue committee, credentialing committee, or other committee that does either of the following:
>
> (a) Conducts professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care; [or]
>
> (b) Conducts any other attendant hearing process initiated as a result of a peer review committee's recommendations or actions.

Ohio Rev. Code § 2305.25(E)(1).

5

> health care entity[4] shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider, including both individuals who provide health care and entities that provide health care, arising out of matters that are the subject of evaluation and review by the peer review committee.

Ohio Rev. Code § 2305.252 (footnotes added). At a bare minimum, the party claiming the privilege must bring to the court's attention the existence of a peer review committee and show the committee investigated the case in question. *Manley v. Heather Hill, Inc.*, 175 Ohio App. 3d 155, 160, 885 N.E. 2d 971, 974 (Ohio Ct. App. 11th Dist. 2007). The party must establish: (1) the existence of a committee that meets the definition of a "peer review committee"; and (2) that each of the documents over which it asserts the privilege is a "record within the scope of a peer review committee." *Smith v. Cleveland Clinic*, No. 96751, 2011 WL 6813167, at *4 (Ohio Ct. App. 8th Dist. 2011). The party also must provide evidence as to the specific documents requested over which it asserts the privilege. *Id.*

Plaintiffs argue:

- The Documents are "records within the scope of a peer review committee of a health care entity";

- IPI is a "health care entity," and Briganti is a "health care provider," under the

---

[4] A "health care entity" is defined as follows:

> "Health care entity" means an entity, whether acting on its own behalf or on behalf of or in affiliation with other health care entities, that conducts as part of its regular business activities professional credentialing or quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers, including both individuals who provide health care and entities that provide health care.

Ohio Rev. Code § 2305.25(A)(1).

6

> statute;
>
> - This is a civil action against a health care entity (IPI) or health care provider (Briganti); therefore,
> - The documents are privileged under the statute.

(Pls.' Mot. Protective Order 6-10.) Defendants respond that § 2305.252 "does not apply when the healthcare entity raising the protection of the statute is the [p]laintiff," and that IPI is not a "health care entity" under the statute. (Defs.' Response 5-6.)

Defendants contention that Plaintiffs, because of their status as plaintiffs, cannot invoke § 2305.252 is unsupported by the plain language of § 2305.252. The statute states that "records within the scope of a peer review committee of a health care entity . . . shall not be subject to discovery or introduction in evidence in any civil action against *a* health care entity," not against *the* health care entity previously mentioned in the sentence to whom the records belong. *See* Ohio Rev. Code § 2305.252 (emphasis added). In other words, the plain language of the statute does not limit in what role—either as the plaintiff or the defendant—a health care entity may assert the privilege. It is a fundamental rule of statutory construction that, when the meaning of a statute is unambiguous, it must be applied as written and no further interpretation is necessary.[5] *Manley,* 175 Ohio App. 3d at 162, 885 N.E.2d at 975-76.

---

[5] Nevertheless, Defendants cite three cases in support of their contention that Plaintiffs cannot invoke § 2305.252 because they are the plaintiffs: *Badri v. Huron Hosp.*, 691 F. supp. 2d 744 (N.D. Ohio 2010); *Wall v. Ohio Permanente Med. Grp., Inc.*, 119 Ohio App. 3d 654, 695 N.E.2d 1233 (Ohio Ct. App. 8th Dist. 1997); and *Chalal v. Nw. Med. Cntr., Inc.*, 147 F. Supp. 2d 1160 (N.D. Ala. 2000). The courts in *Badri* and *Chalal* addressed claims under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101 through 11152, and Defendants do not explain the relevance of those cases to this case. Further, the court in *Wall* found that the trial court did not abuse its discretion

Furthermore, this is a suit against a health care entity, as IPI fits the definition of a health care entity under § 2305.252. The record reflects that IPI engaged in quality review activities involving the competence of, professional conduct of, or quality of care provided by the nurses that it staffed. Defendants admit that IPI is in the business of placing nurses in participating institutions pursuant to contract, and that IPI employed Briganti while Briganti worked at Huron Hospital. (Defs.' Answer ¶¶ 3, 5.) Plaintiffs point out that, under a section titled "Quality Review Program," the plain language of the Master Agreement governing the staffing relationship between IPI and Plaintiffs at the time M.D. died shows that IPI engaged in quality review activities:

> Agency represents and warrants that it has a quality review program reflecting the requirements of this Master Agreement and Participating Institutions and as required by applicable laws. Agency's quality review program must also include the ability to provide quality review and support services for incidents that may occur during staff assignment for responding to service concerns or complaints. Agency must have a procedure in place to confirm that Agency complies with the documentation requirements set forth in Section IV.B. of this Master Agreement. Agency must make all reasonable efforts to notify OHA Solutions of quality issues reported to the Agency by Participating Institutions and to identify the corrective actions taken.[6]

(*See* Doc. No. 45-1, at 17-18.)

---

when it refused to compel the disclosure of peer review materials that belonged to the defendant pursuant to Ohio's peer review statutes; the court did not hold or even address whether plaintiffs could invoke the peer review privilege pursuant to § 2305.252.

[6] Although Plaintiffs quote the language of Part IV, Section F of the Master Agreement, they incorrectly cite exhibit A attached to their complaint as the location of that information. However, Defendants filed the Master Agreement in support of their motion for summary judgment, and the language in Part IV, Section F of that document is identical to the language quoted by Plaintiffs. (Doc. No. 45-1, at 17-18.)

It is not disputed that Plaintiffs are health care entities under § 2305.252, and that Briganti provided health care to M.D. before M.D. died. Plaintiffs offer the deposition testimony of Ms. Michele Reali-Sorrell ("Reali-Sorrell") and the Moskowitz declaration in support of their contention that a peer review committee exists and reviewed the circumstances surrounding M.D.'s death, and that the Documents are within the scope of the peer review committee. Reali-Sorrell testified that: she was an assistant nurse manager at Huron Hospital's emergency department when M.D. died; a peer review committee convened to investigate M.D.'s death; and she was involved with the peer review committee. (Michele Reali-Sorrell Dep. 29:18-22, 149:10-15, Doc. No. 68.) Moskowitz declares, in part, the following:

- She is a Registered Nurse and a licensed attorney who, as of February 6, 2008, was an employee within Plaintiffs' Office of General Counsel.

- The circumstances of M.D.'s death were presented to a peer review/quality assurance committee on several occasions.

- A part of this peer review/quality assurance process, the SERS report (bates numbers 33-36) was prepared in part by her for purposes of peer review, quality assurance, and in anticipation of litigation.

- The CCHS Claim Review Report (bates numbers 2-10) was prepared by her in evaluating the potential issues that could lead to legal liability and quality of care implications for other patients, and was submitted to the legal department.

- The risk management timeline and notes (bates numbers 11-20 and 25-26) were compiled by her in her role as a Clinical Risk Manager performing risk management and peer review/ quality assurance functions.

- Her notes (bates numbers 21-24) describe the peer review/quality assurance RCA investigation and peer review/quality assurance meetings, and also were prepared in anticipation of litigation.

- The RCA report (bates numbers 27-32) was created by and for the multi-disciplinary peer review/quality assurance committee.

9

(*See* Moskowitz Decl. ¶¶ 1-6.) Plaintiffs presented the Documents to the Magistrate Judge for *in camera* inspection.

Upon consideration of Plaintiffs' updated privilege log, Reali-Sorrell's deposition testimony, and the Moskowitz declaration, and upon reviewing the Documents *in camera*, the Court is satisfied that Plaintiffs have established the existence of a peer review committee that reviewed the circumstances surrounding M.D.'s death, and that the Documents are within the scope of the peer review committee. Reali-Sorrell's testimony and Moskowitz's statements are corroborated by the nature and content of the Documents.[7]

Defendants contend, however, that even if the peer review privilege applies to the Documents, the Documents still should be discoverable pursuant to the "fairness doctrine," and because Plaintiffs have waived the peer review privilege by putting the Documents "at issue" in this case. The Court disagrees with both contentions. Defendants concede that "Ohio has not expressly adopted the 'fairness doctrine'" (Defs.' response 9), so the Court finds no reason to apply it in this case.[8] Further, the case on which Defendants rely in support of their argument that Plaintiffs have waived

---

[7] Defendants contend that Reali-Sorrell's deposition testimony is insufficient to establish that the SERS report was created for purposes of the peer review committee; however, Moskowitz's declaration supports the conclusion that the SERS report was created for such purposes, and Reali-Sorrell's deposition testimony does not contradict Moskowitz's declaration.

[8] Defendants argue that Plaintiffs cannot use the documents as both a "sword" and a "shield." But Defendants have never explained how Plaintiffs are using the documents as a sword. Further, Plaintiffs assure in their reply that they will not use the documents at trial if the Court finds that they are privileged under the peer review statute and are not discoverable. (Pls.' Reply 5.)

the peer review privilege, *Menda v. Springfield Radiologists, Inc.*, 136 Ohio App. 3d 656, 737 N.E.2d 590 (Ohio Ct. App. 2d Dist. 2000), in inapposite.  In *Menda*, the question before the court was whether a defendant who placed his mental health at issue as a plaintiff in a prior, unrelated case could enjoy physician-patient privilege over the same information about his mental health in the present case.  *Menda v. Springfield Radiologists, Inc.*, 136 Ohio App. 3d 656, 660, 737 N.E.2d 590, 593 (Ohio Ct. App. 2d Dist. 2000).  The court held that the defendant could not, as the plain language of the Ohio statute setting forth the physician-patient privilege stated that the privilege "does not apply if the patient files a medical claim or 'any other type of civil action' which puts the mental or physical condition about which he saw the physician at issue."  *Id.* (quoting Ohio Rev. Code § 2317.02(B)).  The facts and law are entirely different here: the peer review privilege is governed by a different statute that does not contain waiver language such as that found in the physician-patient privilege statute; and Defendants fail to point to an occasion when Plaintiffs utilized and/or disclosed the documents in their favor in a prior case.

In sum, Plaintiffs have adduced sufficient evidence to establish that the Documents are privileged as peer review materials under § 2305.252.  Accordingly, Plaintiffs' motion for a protective order is granted on this ground.

**B.    The Attorney-Client Privilege and Work Product Doctrine**

Plaintiffs also contend that the Documents are protected from discovery by the attorney-client privilege and work product doctrine.  For the following reasons, the Court agrees.

11

Ohio Revised Code section 2317.02(A)(1) codifies and defines the common law nondisclosure privilege arising from the attorney-client relationship and provides that an attorney shall not testify "concerning a communication made to the attorney by a client in that relation or the attorney's advice to a client, except that the attorney may testify by express consent of the client." *Flynn v. Univ. Hosp., Inc.*, 172 Ohio App. 3d 775, 779, 876 N.E.2d 1300, 1303 (Ohio Ct. App. 1st Dist. 2007). The privilege encompasses communications made to an employer's counsel by employees and protects against compelled disclosure of actual attorney-client communications by employees when the communications are made in anticipation of litigation. *Id.* Generally, the privilege covers incident reports prepared for the risk-management department of a hospital. *Id.*

Unlike the attorney-client privilege, the work product doctrine is governed by federal law. *Little Italy Dev., LLC v. Chicago Title Ins. Co.*, No. 1:11-cv-112, 2011 WL 4944259, at *6 (N.D. Ohio Oct. 17, 2011) (Gaughan, J.) (citing *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir.2009)). Federal Rule of Civil Procedure 26(b)(3) protects from disclosure "documents and tangible things that are prepared in anticipation of litigation . . . by or for another party or its representative." *Id.* (quoting Fed. R. Civ. P. 26(b)(3)). To determine whether a document has been prepared "in anticipation of litigation," and is thus protected work product, courts ask two questions: (1) whether that document was prepared "because of" a party's subjective anticipation of litigation, as contrasted with ordinary business purpose; and (2) whether that subjective anticipation was objectively reasonable. *Prof'ls Direct*, 578 F.3d at 439. If a document is prepared in anticipation of litigation, the fact that it also serves an ordinary

12

business purpose does not deprive it of protection; but the burden is on the party claiming protection to show that anticipated litigation was the "driving force" behind the preparation of each requested document. *Id.*

Here, Moskowitz declares that she—as a licensed attorney, Clinical Risk Manager, and employee in Plaintiffs' Office of General Counsel—compiled the information in the Documents and participated in their creation for purposes of peer review, quality assurance, and in anticipation of litigation; and that she participated in peer review and quality assurance meetings. Reali-Sorrell's deposition testimony (*see* Tr. 153:14-154:2) and a review of the Documents *in camera* confirm these sworn statements. Plaintiffs' anticipation of litigation was objectively reasonable, as the record reflects that M.D. was admitted to the emergency department for alcohol intoxication; was not fully connected to the emergency department's monitoring system; and was found dead the following morning. As Reali-Sorrell's deposition points out, questions about the standard of care became immediately apparent because M.D. died in a bed in the emergency room and there was no attempt to resuscitate. (*See* Reali-Sorrell Dep. 34:17-21.) Accordingly, the Court concludes that the Documents are protected by the attorney-client privilege and work product doctrine.[9]

---

[9] Defendants argue that a statement made by Briganti in the SERS report is not protected by attorney-client privilege because it is not a communication between an employee and counsel for the purposes of securing legal advice, as Briganti was an employee of Plaintiffs. Defendants do not address the statement in the context of work product or the peer review privilege. Defendants also point out deficiencies in Plaintiffs' evidence in support of their arguments that the Documents are privileged and protected from production; however, those deficiencies have been remedied with the introduction of the Moskowitz affidavit and updated privilege log.

Defendants contend that, even if the Documents are protected by the work product doctrine, good cause exists for compelling the production of the Documents for reasons including that Briganti's alleged statement in the SERS report is necessary to refresh Briganti's recollection of the circumstances surrounding M.D.'s death, as the event occurred over four years ago.[10]  (Defs.' Response 15-16.)  Indeed, materials protected by the work product doctrine may nevertheless be discoverable if the party seeking the materials "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Defendants have not made such a showing.  Defendants have not cited legal authority for permitting Briganti to refresh his memory with his alleged statement in the SERS report; and the Court is not persuaded that the statement is necessary to refresh Briganti's recollection because (1) the circumstances surrounding M.D.'s death appear extraordinary, (2) Defendants have presented no foundation or evidence in support of a claim that Briganti's recollection is exhausted and must be refreshed, and (3) Defendants have failed to show that M.D.'s medical records are insufficient to refresh any deficiencies in Briganti's memory.

---

[10] Defendants also complain that Plaintiffs have curtailed Defendants' discovery efforts at nearly each and every step of this litigation and argue their need for the Documents outweighs Plaintiffs' privilege because "the Court has limited Defendants in discovery to a total of 660 minutes of fact witness deposition time, gutting Defendants' ability to discover information from other sources"; and Defendants suggest that it is not fair that Plaintiffs can claim Defendants should have paid for settling with M.D.'s estate but refuse to share the information contained in their investigation on which they base their claim. (Defs.' Response 15-16.)  These arguments lack merit, in part because (1) the Court has concluded that the Documents are privileged, (2) this is an inappropriate challenge to Judge Gwin's order limiting fact depositions, and (3) the underlying medical records are available to Defendants.

14

**III.**

For the foregoing reasons, Plaintiffs' motion for a protective order is GRANTED.

**IT IS SO ORDERED**.

*s/ Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: May 3, 2012

# APPENDIX

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CLEVELAND CLINIC HEALTH SYSTEM- EAST REGION d/b/a HURON HOSPITAL, et al., | CASE NO. 1:11-cv-02074-JG |
| | JUDGE JAMES S. GWIN |
| Plaintiffs, | MAGISTRATE JUDGE NANCY VECCHIARELLI |
| v. | |
| INNOVATIVE PLACEMENTS, INC., et al., | **DECLARATION OF CAROL J. MOSKOWITZ** |
| Defendants. | |

I, Carol J. Moskowitz, declare as follows:

1. I am a Registered Nurse and an attorney licensed to practice in the State of Ohio.

   I am employed as a Clinical Risk Manager for Cleveland Clinic Health System – East Region, and have served in this capacity for six years. As of February 6, 2008, I was an employee within the Office of General Counsel.

3. The events involving the death of M.D. at Huron Hospital on February 6, 2008 were presented to a peer review/quality assurance committee on several occasions, made up of people from the quality department, those involved in the event, and clinical risk management. As part of this peer review/quality assurance process, a root cause analysis ("RCA") investigation was performed, presented and developed with the peer review/quality assurance committee, and then the committee issued further recommendations. I participated in these various aspects of the peer review/quality assurance process in the wake of the death of M.D. The death of M.D. was investigated as a possible "sentinel event," which is a clinical risk management/quality assurance term of art referring to an unexpected event in a healthcare setting involving death or serious

injury to a patient, of a nature which prompts the possible need for peer review/quality assurance evaluation.

4. As a part of this peer review/quality assurance process, a Safety Event Reporting System ("SERS") report was prepared for purposes of peer review, quality assurance, and in anticipation of litigation. A SERS report is like an incident report, compiled by multiple personnel with the expectation of confidentiality arising from Ohio's peer review/quality assurance and incident report statutes, and also the attorney-client privilege. It is separate and distinct from, and not a part of the patient's medical chart. The SERS report was provided to and reviewed by members of the peer review/quality assurance committee as part of their peer review/quality assurance process.

5. The CCHS Claim Report is a Clinical Risk Management form prepared (in this case) by me, at the direction of the attorneys in the Law Department, in my role as Clinical Risk Manager, in anticipation of litigation and for peer review/quality assurance purposes. This form is primarily created to evaluate potential liability from a medical-legal perspective, and is submitted to the Law Department for that purpose.

6. I have reviewed the 36 pages of documents submitted to the Court *in camera* on April 17, 2012. These 36 pages are bates numbered *CC v. IPI PI Peer Review 2-36* (page 1 is a cover sheet). These are all documents that the Cleveland Clinic considers to be confidential because they contain peer review/quality assurance materials, attorney-client communications and attorney work product. In particular, the 36 pages consist of:

   a. The Cleveland Clinic Clinical Risk Management internal "CCHS Claim Review Report" prepared by me evaluating the potential issues that could lead to legal liability and quality of care implications for other patients, arising from the events in question (bates numbers 2-10). There are three different copies which are essentially identical but for the dates printed at the end (June 6, 2008, January 15, 2010, and February 5, 2010), because the electronic form adds in the date when

2

the form is accessed and/or printed, and it was accessed and/or printed on three separate occasions, by me. My name appears at the bottom of all three;

b. The risk management timeline and notes compiled by me, in my role as a Clinical Risk Manager performing risk management and peer review/quality assurance functions (bates numbers 11-20, 25-26). The timeline was prepared in anticipation of the peer review/quality assurance meetings, likely in February and March of 2008. Page 25 reflects my notes of a risk management phone call with Michele Reali-Sorrell, on February 6, 2008. Page 26 is my handwritten notes reflecting my review of the medical records, in the performance of my risk management duties, as part of the preparation of the CCHS Claim Review Report, and as part of the root cause analysis investigation to be presented to the peer review/quality assurance committee;

c. My notes describing the peer review/quality assurance Root Cause Analysis ("RCA") investigation and peer review/quality assurance meetings when the events in question were analyzed by personnel from multiple disciplines, including clinical risk management (me, as I was in attendance), quality, and medical personnel in February and March of 2008, in the wake of the patient's death (bates numbers 21-24). These were also prepared in anticipation of litigation;

d. The Root Cause Analysis report created by and for the multi-disciplinary peer review/quality assurance committee in the wake of the patient's death (bates numbers 27-32); and

e. Two print-outs of the two-page Cleveland Clinic Safety Event Reporting System ("SERS" report) quality review incident report, printed by me as a Cleveland Clinic Clinical Risk Manager and containing handwritten notes in the margin drafted by me -- an electronic database report which contains categories of information such as "Risk/Quality Follow Up Status" drafted, in part, by me (bates numbers 33-36). Different parts of the SERS report were drafted at different times, beginning on February 6, 2008.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _24th_ day of April 2012.

_____
CAROL J. MOSKOWITZ, R.N, Esq.

011218.000005 1444560.1

3